UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                Case No. 8:16-cr-292-T-17AEP

JORGE EDUARDO MIRANDA

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This MATTER is before the Court on Defendant Jorge Eduardo Miranda's ("Defendant") Motion to Suppress Evidence ("Motion") (Dkt. No. 61), which was referred to the undersigned by the Honorable Elizabeth A. Kovachevich for a Report and Recommendation. By his Motion, Defendant requests suppression of any evidence obtained and all statements allegedly made by him to investigators on June 5, 2016. Defendant argues that the evidence and alleged statements should be suppressed because (1) the alleged investigatory stop of Defendant on June 5, 2016 was unlawful because no reasonable suspicion existed warranting the investigative stop; (2) the search of Defendant's residence was "fruit of the poisonous tree" from the unlawful investigatory stop and was warrantless and non-consensual; and (3) the alleged statements made by Defendant were also "fruit of the poisonous tree" from the unlawful investigatory stop and were made by Defendant while he was in custody and prior to being read his *Miranda*[1] rights. In response, the United States asserts that based upon the totality of the circumstances, law enforcement had more than sufficient reasonable

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

suspicion to justify an investigative traffic stop of Defendant on June 5, 2016, that after the traffic stop, Defendant voluntarily consented to the search of his residence and vehicles, and that Defendant was properly *Mirandized* prior to making any custodial statements. (*See* Dkt. No. 62.) The parties appeared before the Court for an evidentiary hearing on December 19, 2016, and on February 10, 2017.[2] During the evidentiary hearings, the United States called as witnesses Drug Enforcement Agency ("DEA") Special Agent ("SA") Hayley Hovhanessian ("SA Hovhanessian"), DEA SA Andrew Scripture ("SA Scripture"), DEA SA Anthony Spatola ("SA Spatola"), DEA Group Supervisor ("GS") Rodolfo Cesario ("GS Cesario"), DEA Task Force Officer ("TFO") Michael Skoumal ("TFO Skoumal"), and DEA SA Jose Ramirez ("SA Ramirez"), while, in turn, Defendant testified in support of his Motion. For the reasons stated herein, the undersigned finds that DEA lawfully conducted a traffic stop of Defendant on June 5, 2016, Defendant voluntarily consented to a search of his residence and vehicles, and Defendant was properly advised of his *Miranda* rights. Thus, the undersigned recommends that Defendant's Motion (Dkt. No. 61) be denied.

## I. Findings of Fact

In April 2016, the DEA initiated an investigation regarding Francisco Ortiz-Castillo ("Ortiz") based upon the information of a cooperating defendant ("CD"). During a proffer in May 2016, the CD identified Ortiz as a cocaine distributor. As part of the investigation into Ortiz's activities, DEA agents conducted surveillance in May 2016, at Ortiz's place of business, Ortiz Auto Repair, and at a residence associated with Ortiz, 6115 Bayshore Road ("Ortiz residence"). At one point during surveillance, DEA agents observed a vehicle registered to

---

[2] The Court conducted the February 10, 2017 hearing upon granting the United States' Motion to Reopen the Suppression Hearing (Dkt. No. 71).

Defendant at his home address of 1921 3rd Avenue West in Palmetto, Florida ("Defendant's residence"). Notably, Defendant was not observed in the vehicle during the surveillance. Additionally, a review of Ortiz's phone toll records reflected that a phone subscribed to Defendant at his residence was in frequent[3] contact with Ortiz's phone. Detective Joe Petta of the Manatee County Sheriff's Office, who was assisting in the Ortiz investigation, recognized Defendant's name and address from another drug investigation. Around May 25, 2016, Detective Petta informed SA Hovhanessian that a cooperating defendant in one of his prior investigations had cooperated and identified Defendant as a cocaine supplier. Detective Petta specifically informed SA Hovhanessian that the cooperating defendant stated that Defendant distributed kilogram quantities of cocaine out of Defendant residence, and that Defendant used the residence as a stash house to store cocaine.

To further the Ortiz investigation, the DEA in late May 2016 utilized the CD to conduct a series of controlled recorded phone calls to Ortiz, during which Ortiz eventually agreed to deliver one kilogram of cocaine to the CD. In anticipation of conducting a transaction with Ortiz, SA Hovhanessian, as the case agent managing the Ortiz investigation, solicited the assistance of other DEA agents to conduct surveillance from both the air and the ground during the impending transaction. Further, SA Hovhanessian provided all agents participating in the Ortiz investigation with a photograph of Defendant and informed them about the information provided to her about Defendant from Detective Petta. The CD, who was making the controlled calls from jail at the direction of the DEA, called Ortiz at approximately 2:40 pm on June 5, 2016, to request that Ortiz deliver a kilogram of cocaine to the CD's residence. On that same

---

[3] SA Hovhanessian testified that based upon the number of contacts, she estimated Defendant's phone was in the top ten of phones communicating with Ortiz's phone.

day, DEA agents located Ortiz's pickup truck at a residence in Palmetto, Florida, and began to observe him by air and ground surveillance. Approximately one minute after the controlled call with the CD, DEA agents observed Ortiz leave the residence, get into his truck, and drive away. Notably, Ortiz was not carrying anything in his hands when he got into his truck. DEA maintained surveillance on Ortiz and followed him to Defendant's residence. Specifically, SA Scripture, who was part of the air surveillance, observed Ortiz travel directly to Defendant's residence. However, while at Defendant's residence, both air and ground surveillance were not able to observe anyone get out of Ortiz's truck or approach the truck from the residence due to tree cover. Ortiz's truck was observed departing Defendant's residence within approximately three minutes. Although Ortiz departed Defendant residence's, based upon her prior information about Defendant and in her experience that drug traffickers maintain drugs at stash houses, SA Hovhanessian directed other agents, including GS Cesario and SAs Spatola and Skoumal to maintain surveillance at the Defendant's residence. Further, SA Hovhanessian again sent each of the agents a photograph of Defendant to remind them of what Defendant looked like. After leaving Defendant's residence, Ortiz's truck was then observed travelling directly to the CD's residence, where Ortiz arrived within approximately five minutes. At the CD's residence, DEA agents arrested Ortiz at approximately 2:55 pm, and found him in possession of a shoe box containing approximately 1.12 kilograms of cocaine. In total, approximately fifteen minutes elapsed from the CD's call to Ortiz requesting delivery of the cocaine until Ortiz's arrest at the CD's residence.

Immediately following Ortiz's arrest, DEA's air surveillance was directed to return to Defendant's residence to maintain surveillance at the residence. SA Scripture estimated that there was an eight- to nine-minute period from when he ended surveillance at Defendant's

residence to maintain observations of Ortiz after Ortiz left Defendant's residence until the time the air surveillance returned to Defendant's residence after Ortiz's arrest. Soon after air surveillance returned to Defendant's residence, SA Scripture observed a blue vehicle ("the blue vehicle") depart from Defendant residence. Notably, the blue vehicle was previously observed by SA Scripture at Defendant's residence during Ortiz's brief stop at the residence. SA Hovhanessian directed agents to conduct a stop of the blue vehicle. At approximately 3:45 pm, SA Spatola initiated a stop of the blue vehicle, which occurred around the corner from Defendant's residence on 3rd Avenue West, north of 17th Street West. *See* Government Ex. No. 2. Driving at a normal rate of speed in an unmarked car, SA Spatola pulled in front of the blue vehicle with his police lights activated in order to stop the vehicle. SA Spatola then exited his car without his gun drawn, approached the blue vehicle, and immediately identified Defendant[4] as the only occupant of the vehicle. SA Spatola asked Defendant to exit the blue vehicle so they could talk. Within moments of SA Spatola's stop of Defendant, GS Cesario and SA Skoumal arrived on the scene. GS Cesario, as a Spanish speaker, translated the conversation between the agents and Defendant. SA Spatola advised Defendant about the nature of DEA's investigation and told Defendant that he would like to discuss the investigation with him further.

SA Spatola specifically asked Defendant if he would be willing to travel with him in his vehicle back to Defendant's residence to discuss the matter further. SA Spatola also asked Defendant if another agent could drive the blue vehicle back to Defendant's residence. Defendant agreed to drive back with SA Spatola back to Defendant's residence, and agreed

---

[4] SA Spatola identified Defendant from the photograph of Defendant that was provided to him by SA Hovhanessian.

with the agents to just have the blue vehicle remain parked off the side of the street near where Defendant was stopped. Additionally, prior to leaving the scene of the stop, the agents asked Defendant for consent to search the blue vehicle. Based upon Defendant's verbal consent to search, the blue vehicle was then searched with no significant results. At all times during the stop, none of the agents had their guns drawn or yelled at Defendant or demanded compliance from Defendant. Further, Defendant was not handcuffed at any time during the stop.

SA Spatola then drove Defendant back to Defendant's residence in SA Spatola's vehicle. There were no other occupants in SA Spatola's vehicle and Defendant rode in the front passenger seat of SA Spatola's vehicle. Defendant was not placed in handcuffs for the ride back to his residence. At Defendant's residence, agents asked Defendant for consent to search the residence. Defendant agreed to allow agents to search his residence, but requested that the agents allow his family members to leave the residence before the search. The DEA agents allowed Defendant's family to leave the residence, and Defendant gave the agents permission to search his house. Specifically, Defendant signed a written Consent to Search form (Govt. Ex. No. 2) granting the DEA permission to search his residence at 1921 3rd Avenue West. The Consent to Search form expressly stated that Defendant had "not been threatened, nor forced in any way" and that he "freely consent[ed] to [the] search." *See id.* GS Cesario let Defendant review the consent form and also translated the form into Spanish for Defendant.[5] Defendant signed the form at approximately 3:51 pm. *See id.* Defendant also signed an additional Consent to Search form (Govt. Ex. No. 1), which related to a search of the memory/storage of video security system at Defendant's residence. As agents searched the garage of Defendant's

---

[5] Defendant was given the option of signing a Consent to Search form in the Spanish language, but Defendant declined the Spanish language version of the form.

residence, SA Spatola found several brick-shaped objects beneath an air conditioning unit in the garage, which were later confirmed to contain approximately 3.5 kilograms of cocaine. While agents searched the garage, Defendant entered the garage with GS Cesario, and Defendant was present when agents found the cocaine, as well as over $100,000 inside a trap in a car in the garage.[6] At Defendant's house, SA Jose Ramirez ("SA Ramirez") read Defendant his *Miranda* rights at approximately 4:43 pm. Defendant was not placed in handcuffs until after he was advised of *Miranda* warnings and about to be transported to the Pinellas County jail.

## II. Analysis and Conclusions of Law[7]

There are three primary issues before the Court: (1) the legality of the investigative traffic stop of Defendant and Defendant's return to his residence with the DEA after the traffic stop; (2) the validity of Defendant's consent to search his residence; and (3) whether Defendant was advised of his *Miranda* rights, and if so, the legitimacy of Defendant's statements before and after he was advised of the *Miranda* warnings.

A. **The Investigative Traffic Stop of Defendant was Lawful and the Return to Defendant's Residence was Consensual**

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is well established that a roadside traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *see also, United States v. Smith*, 448 F. App'x 936, 938 (11th Cir. 2011)

---

[6] After searching the rest of Defendant's house, agents found another 3.5 ounces of cocaine, a silver scale, a loaded pistol, and the video security system.

[7] To the extent that any of the following conclusions of law may represent findings of fact, the Court adopts them as such.

(stating that "[a] traffic stop constitutes a 'seizure' within the meaning of the Fourth Amendment's protection against 'unreasonable searches and seizures.'") (citations omitted). However, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Generally such a stop must be supported by at least a reasonable, articulable suspicion that criminal activity is afoot. *Prouse*, 440 U.S. at 663, 99 S.Ct. 1391. "It is well-established, however, that a police officer may conduct a brief investigative stop of a vehicle . . . if the seizure is justified by specific articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct." *Id.* (internal quotations omitted). Reasonable suspicion "requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is a less demanding standard than probable cause and requires a showing "considerably less than preponderance of the evidence." *Id.* It requires only a "fair probability that illegal activity has occurred." *United States v. Bivens*, 204 F. App'x 835, 836 (11th Cir. 2006) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). A law enforcement officer meets the "reasonable suspicion" standard when they have "a particularized and objective basis to suspect a person of criminal activity." *United States v. Baker*, 599 F. App'x 904, 905 (11th Cir. 2015) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). In determining whether reasonable suspicion exists, courts evaluate the totality of the circumstances from the perspective of an objectively reasonable police officer, giving due weight to the officer's experience. *Baker*, 599 F. App'x at 905. Courts determine reasonable suspicion based on the collective knowledge of the officers. *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006).

Here, although the DEA had no idea what events would take place after the CD requested a kilogram of cocaine from Ortiz on June 5, 2016, it was not just simply clairvoyance that prompted SA Hovhanessian in anticipation of the June 5, 2016 transaction to provide a photograph of Defendant to her fellow agents. Rather, SA Hovhanessian was prompted to provide her colleagues with Defendant's photograph based upon her knowledge of the toll records obtained during the investigation, the surveillance of a vehicle registered to Defendant at Ortiz's business, and the information about Defendant's involvement in cocaine distribution at his residence from a cooperating defendant in a prior investigation. Armed with this information prior to June 5, 2016, SA Hovhanessian at least anticipated a possibility that the DEA may encounter Defendant in a drug transaction with Ortiz. SA Hovhanessian's anticipation of encountering Defendant was solidified by the events that transpired on June 5, 2016, when the CD ordered a kilogram of cocaine from Ortiz.

After discussing the kilogram transaction with the CD, Ortiz was observed by agents leaving his residence with nothing in his hands. Ortiz was then observed driving directly to Defendant's residence where he stayed for no more than three minutes. After his brief stay at Defendant's residence, Ortiz was then observed traveling directly to the CD's residence. At the CD's residence Ortiz is arrested with just over a kilogram of cocaine located in a shoe box. Given that Ortiz was observed leaving his residence without a shoe box in his hands, and given the nature and timing of Ortiz's travels from his residence, to Defendant's residence, and then to the CD's residence, it was reasonable for the DEA to suspect that Ortiz may have obtained the shoe box of cocaine at Defendant's residence. Further, given the connections between Defendant and Ortiz based upon the toll records and surveillance of Defendant's vehicle, along with the historical information regarding Defendant storing and distributing cocaine from his

residence, it was reasonable for the DEA to suspect that Ortiz obtained the shoe box of cocaine from Defendant at his residence. Thus, given the totality of the circumstances known to the DEA on June 5, 2016, the DEA was justified in conducting a *Terry* stop on Defendant.

Notably, the blue vehicle was first observed by air surveillance at Defendant's residence during Ortiz's brief stop at the residence. After Ortiz left Defendant's residence, air surveillance continued to follow Ortiz until his arrest. Thus, Defendant's residence and the blue vehicle were not observed by air surveillance for an estimated period of approximately 7-9 minutes. However, after Ortiz left Defendant's residence, ground surveillance was maintained at Defendant's residence and no vehicles were observed leaving Defendant's residence until Defendant was eventually stopped in the blue vehicle. Approximately fifty minutes had lapsed from the time of Ortiz's arrest until the DEA stopped Defendant around the corner from his residence in the blue vehicle. Although the DEA was unaware that Defendant was the driver of the blue vehicle at the time of the stop, the DEA was nonetheless still justified in conducting an investigative stop of the vehicle given that: (1) the DEA had reasonable suspicion to believe that criminal conduct occurred at Defendant's residence and that Defendant may have been involved with such criminal conduct; (2) less than one hour of time had lapsed from when Ortiz was arrested until Defendant was stopped in the blue vehicle around the corner from his residence; and (3) no vehicles were observed leaving Defendant's residence until Defendant departed in the blue vehicle. *See United States v. Martinez-Gonzalez*, 686 F.2d 93, 99 (2d Cir. 1982) (stating that agents' "strong suspicions" that an apartment was being used as a "stash pad" for drugs justified them conducting a *Terry* stop of "any persons seen entering or exiting" the apartment). In other words, the DEA had reasonable suspicion to believe that the driver of the blue vehicle was present at Defendant's residence during a drug transaction, which thus

justified DEA's stop of the blue vehicle to investigate further by questioning and identifying the driver of the blue vehicle. Therefore, under the principles of *Terry*, Defendant was lawfully stopped in the blue vehicle.

Significantly, the principles of *Terry* provide that once the DEA agents stopped Defendant, they were entitled to conduct an investigation "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868. The scope of a Fourth Amendment intrusion "will vary to some extent with the particular facts and circumstances of each case." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). This means that the Fourth Amendment intrusion "must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and that the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion. *Id.* Here, the DEA agents were justified in their investigative actions at the scene of the traffic stop. However, the justification of the investigative detention of Defendant during the traffic stop remained at the scene of the traffic stop. Once Defendant was transported back to his residence, then the legitimate investigative purposes of the traffic stop were completed. However, not all encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868. Significantly, a consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment. *Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). Thus, even if the justification of the DEA's investigative detention of Defendant ceased when Defendant was transported back to his residence, the Fourth Amendment would not prohibit the continued encounter if it was consensual.

The government bears the burden of proving voluntary consent based on a totality of circumstances. *United States v. Beckham,* 505 F.2d 1316, 1318 (5th Cir.1975).[8] "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Perez,* 443 F.3d 772, 777–78 (11th Cir. 2006) (quotations and emphasis omitted). If a person's cooperation is induced by "coercive means" or if a reasonable person would not "feel free to terminate the encounter," then the encounter is no longer consensual, and a seizure has occurred implicating the person's Fourth Amendment rights. *United States v. Drayton,* 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). In order to determine whether an encounter with law enforcement was consensual or whether a seizure occurred, the following factors should be considered:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

*Perez,* 443 F.3d at 778 (quotations omitted). These factors are not to be applied rigidly, but rather used as relevant guidance, to be considered "among other things." *Id.* The ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority. *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

Here, during the traffic stop no one was combative or yelled at Defendant, and no demands or instructions were directed to Defendant. Further, at no point were any of the agents'

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

guns drawn as a show of force against Defendant. Significantly, Defendant was not ordered to return with the agents back to his residence. Rather, SA Spatola asked Defendant if he would be willing to return to his residence with SA Spatola. SA Spatola also asked Defendant if he would agree to have one of the other agents drive the blue vehicle back to the residence, but it was agreed that the blue vehicle would be left parked on the side of the street. Defendant was not cuffed at any point during this time period, and he rode back to his residence as the only other occupant in SA Spatola's vehicle seated in the front passenger seat. Given these facts, the Court finds that the continued encounter between the DEA and Defendant after leaving the scene of the traffic stop was a consensual encounter. In other words, under these circumstances, where it is clear that the agents were not displaying aggression or making any demands of compliance upon Defendant, but rather made an optional request of Defendant to return back to his residence, the Court is satisfied that a reasonable person would have felt free to decline the agents' request to return to the residence and leave the scene. Thus, the investigative detention of the traffic stop had ceased and Defendant's continued encounter with the DEA at his residence was lawfully based upon Defendant's consent to return back to his residence with the agents.

B. **Defendant Voluntarily Consented to the Search of his Residence**

Defendant attacks the validity of the search of his residence by arguing (1) the search was the "fruit of the poisonous tree" from the alleged unlawful investigatory traffic stop, and (2) the warrantless search of the residence was not consensual. As an initial matter, Defendant's "fruit of the poisonous tree" argument must fail given the Court's finding that the traffic stop was lawful and the return to Defendant's residence was consensual. Thus, the remaining issue

related to the warrantless search of Defendant's residence is whether or not the search was done with Defendant's lawful consent.

A warrantless search is presumed to be unreasonable. *Payton v. New York*, 445 U.S. 573 (1980); *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). However, the Fourth Amendment's prohibition of warrantless searches is not absolute and is subject to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973); *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). The government bears the burden of proving an exception to the warrant requirement. *Holloway*, 290 F.3d at 1337. One such exception to the warrant requirement is a search conducted pursuant to a voluntary consent. *Schneckloth*. 412 U.S. at 219. Voluntariness of a consent to search is determined under the totality of the circumstances. *Id*. Consent is not voluntary when it is prompted by a show of official authority. *Ramirez-Chilel*, 289 F.3d at 751. In other words, the inquiry is "whether 'the police conduct would have communicated to a reasonable person that the person was not free to decline the officer[]'[s] request[]' to search . . . ." *United States v. Butler*, 102 F.3d 1191 (11th Cir. 1997) (*quoting Florida v. Bostick*, 501 U.S. 429,439 (1991). A consensual search is constitutional if it is the product of an "'essentially free and unconstrained choice.'" *United States v. Purcell,* 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting *Bustamonte*, 412 U.S. at 225). "In evaluating the totality of the circumstances underlying consent, a court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *Id.*

To establish that he did not give the DEA a voluntary consent to search his residence, Defendant testified that he did not remember what was explained to him about the Consent to Search form to search his residence (Govt. Ex. No. 3), but that if it would have been properly explained to him he would have not provided his consent to search his residence. Defendant further testified that GS Cesario never spoke to him in the Spanish language. Defendant explained that he did not have his drivers' license on his person during the traffic stop, and he was told by the DEA that the Consent to Search form to search his residence (Govt. Ex. No. 3) dealt with his missing drivers' license. In this regard, the Court finds Defendant's testimony wholly incredible. Initially, Defendant claimed that he believed that the Consent to Search form for his residence (Govt. Ex. No. 3) had something to do with his missing driver's license is called into serious doubt by the fact that Defendant signed multiple Consent to Search forms at different times, one for his residence and one for the video security system (Govt. Ex. Nos. 1 & 3). Defendant offered no plausible explanation as to what he believed he was signing when he authorized the Consent to Search form (Govt. Ex. No. 1) for the video security system. Further, the Consent to Search form (Govt. Ex. No. 3) for Defendant's residence is itself highly suggestive of Defendant's informed and voluntary consent. Although Defendant asserted that the form was not read to him in the Spanish language, the Court rejects that testimony and accepts the testimony of GS Cesario and SAs Hovhanessian and Spatola in that Defendant rejected a Spanish version of the form, and that he signed the Consent to Search form (Govt. Ex. No. 3) after it was read to him in Spanish and he acknowledged that he understood the form. Additionally, the Court is satisfied that the DEA did not use any coercive police procedures or tactics. Although Defendant attempted to suggest that he was induced into signing the Consent to Search form (Govt. Ex. No. 3) by being misled to believe that the form had something to do

with his drivers' license, as noted previously, this is belied by the form itself and GS Cesario and SAs Hovhanessian and Spatola's testimony. Further, the fact that agents interacted with Defendant at his residence in the view of many neighbors diminishes the possibility that Defendant's signed Consent to Search form was the product of coercive or threatening police tactics. Also, the fact that Defendant requested that his family be allowed to leave the residence before agents searched the residence is more indicative of a cooperative encounter with the DEA, rather than an encounter where the DEA is dictating and controlling the scene. A cooperative encounter is further suggested by the fact that at no time did any agents draw their weapons, and Defendant was not handcuffed. Simply stated, in consideration of the appropriate factors and the totality of the circumstances, the Court finds that Defendant did voluntarily consent to the search of his residence.

    C.  **Defendant's Pre-Arrest and Post-Arrest Statements**

Defendant contends that he was never advised of his *Miranda* rights by any agent at any time at his residence, and that because he was in "custody" for *Miranda* purposes the DEA agents should have advised him of his rights before questioning him at his residence. The right to *Miranda* warnings attaches when custodial interrogation begins. *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630 (1966); *Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405 (2000). Normally courts apply a two-part test to determine whether a suspect is in custody for *Miranda* purposes: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995). The test is objective; the subjective beliefs of the defendant and the interviewing officers regarding whether the defendant was free

to leave are irrelevant. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The "free to leave" inquiry is not sufficient to resolve the "in custody" question; the defendant must also understand that his freedom to leave is being curtailed to a degree associated with a formal arrest. *United States v. Luna-Encinas,* 603 F.3d 876, 881 (11th Cir. 2010) (*citing Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)).

Here, in light of the Court's findings that the encounter between Defendant and the DEA at his residence was initially consensual and non-custodial, the question is then solely focused upon when the consensual, non-custodial encounter was elevated to a custodial arrest. The clear line of demarcation is when the DEA located the kilogram quantities of cocaine in addition to over $100,000 in U.S. currency in Defendant's garage in the presence of Defendant. Certainly, no reasonable person in Defendant's position would have believed that they would have been free to leave the residence after the DEA located the cocaine and money in the garage. Because Defendant was not in custody for purposes of his *Miranda* rights up to the discovery of the cocaine and money in his garage, then any statements made by Defendant up to that time were constitutional. SA Ramirez testified that he advised Defendant of his *Miranda* rights in Spanish at Defendant's residence at approximately 4:43 pm, in the presence of other agents, specifically including SA Hovhanessian. SA Ramirez stated that Defendant acknowledged that he understood his rights and that he agreed to speak with agents prior to providing several admissions. In turn, Defendant testified in direct contradiction to SA Ramirez, and asserted that no agent at any time at his residence advised him of his *Miranda* rights. Again, the Court finds Defendant's testimony wholly incredible. As an initial matter, Defendant's credibility must be subject to question as he obviously has the most to gain in this matter. Whereas, SA Ramirez and the other agents have no obvious vested interest in the outcome of this matter, and

thus have no known reason to mislead the Court. Further, Defendant's testimony was in direct contradiction of his own argument in his Motion, in which Defendant asserted that "officers waited until after [he] pointed out all the contraband to read him his *Miranda* warnings." (Dkt. No. 61 at 9.) In fact because Defendant directly contradicted his own arguments in his Motion, the Court allowed the United States to re-open the evidentiary hearing to call SA Ramirez to testify about the *Miranda* warnings. (*See* Dkt. Nos. 71 and 85.) For these reasons, the Court rejects as not credible Defendant's testimony and finds that SA Ramirez did properly advise Defendant of his *Miranda* rights. Thus, any of Defendant's alleged statements occurring after he was advised of his warnings by SA Ramirez were voluntarily made because Defendant was properly advised of his *Miranda* rights.[9]

Accordingly, after due consideration and for the foregoing reasons, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress Evidence (Dkt. No. 61) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida, this 18th day of May, 2017.

ANTHONY E. PORCELLI
United States Magistrate Judge

---

[9] Significantly, no specific statements were identified and thereby challenged by Defendant that may have occurred between the time when DEA discovered the cocaine and money in his garage and when SA Ramirez advised Defendant of his *Miranda* rights. Thus, the Court makes no finding as to any such statements, if any statements occurred during that time period.

# NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Copies furnished to:

Hon. Elizabeth A. Kovachevich
Counsel of Record